97 So.2d 589

### J. W. PATRICK

v.

### STATE.

2 Div. 929.

Court of Appeals of Alabama.

Oct. 15, 1957.

Thompson & Beck, Butler, Skidmore & Davidson, Tuscaloosa, and E. C. Boswell, Geneva, for appellant.

John Patterson, Atty. Gen., and Edmon L. Rinehart, Asst. Atty. Gen., for the State.

HARWOOD, Presiding Judge.

This appellant stands convicted of the offense of transporting prohibited liquors in quantities of five gallons or more.

The appellant, at the time of his conviction, and for some fifteen years prior thereto, had been an enforcement agent for the Alabama Alcoholic Beverage Control Board.

The State's evidence tended to show that one Luther Blackmon complained to Sheriff Connie Littlepage that he was being "shaken down" in his liquor operations by the appellant and Clemons, another, A. B. C. enforcement officer.

Blackmon testified he had some 16 or 17 prior convictions in the State courts for violation of our liquor laws, and some 4 prior convictions in the federal courts for the same type of offenses.

According to Blackmon the appellant and Clemons demanded a toll of six gallons of liquor each for one run of his still, and ten gallons each for every two runs. This demand was made after the appellant and Clemons had partially destroyed a still owned by Blackmon, and had told him they had seized his truck near the still. The truck was never actually taken from Blackmon however.

According to Blackmon the demands made on him by the two A. B. C. agents were too high to permit a profitable operation of his illicit undertakings, and that is when he went to the sheriff.

Thereafter, on the night of 26 January 1956, Sheriff Littlepage and his deputy, Cecil Martin, secreted themselves near Blackmon's home. They observed an automobile bearing the tag number of the car driven by the two A. B. C. officers drive up to Blackmon's house, and two men, who they later found to be the appellant and Clemons were in the car.

Clemons got out as Blackmon approached. A conversation ensued between the three, and the officers stated they had not been able to get any sugar; that they were not taking but two gallons that night, and Blackmon was to keep the eight gallons and buy sugar. Two gallon jugs were placed in the car, and the officers told Blackmon they would be back Thursday night for ten gallons of whiskey. This date would apparently be 2 February 1956.

Sheriff Littlepage, within the next few days, turned over to Blackmon 12 one gallon jugs of illicit whiskey, first placing an identification mark under the cap of each jug.

On the afternoon of 2 February 1956, Sheriff Littlepage and several of his deputies again secreted themselves near Blackmon's home. They observed the appellant and Clemons drive up after dark. After containers were loaded in the officers' car they drove off, and were followed by Sheriff Littlepage and some of his deputies.

After a short distance the officers' car was stopped by the Sheriff.

The twelve gallon-jugs, filled with illicit whiskey, and with the marked caps thereon, were found in the agent's car. In addition a case of Ancient Age whiskey was found in the car.

The agents were placed under arrest, and at this time maintained they had run some man off a "stash" of whiskey, and that was when they obtained the illicit whiskey, as well as the case of bonded whiskey.

The defense evidence, developed chiefly through the testimony of the appellant and Clemons, was to the effect that they had destroyed numerous stills in Choctaw County, among them a still of Luther Blackmon; that they had used Blackmon as an informer. They concluded that Blackmon was continuing his illicit whiskey operations, and had gone to his house on the night of 2 February 1956 to tell him they knew of his activities. Blackmon on this occasion had pleaded with them not to take him in that night as his wife was ill and would be left in the rural home alone. Blackmon at this time went into his house and brought out twelve gallons of illicit whiskey which he turned over to them. According to Clemons the pleas of Blackmon "got their sympathy," and they agreed not to take him in at that time.

As to the case of Ancient Age bonded whiskey Patrick testified that George Speigner, of Tuscaloosa, had asked him to pick up a case of whiskey for him at an A. B. C. store, and he had done so, purchasing the whiskey at a store in Boligee. Although Tuscaloosa County was a "dry" county at the time, Patrick had agreed to get the whiskey for Speigner as an accommodation. The trip to Choctaw County intervened before the agents were to return to Tuscaloosa, and the whiskey remained in the car. Speigner testified to the same effect as to this transaction for the delivery of the case of whiskey to him.

The defense was directed toward showing that the appellant and Clemons had destroyed many stills, and still paraphernalia such as jugs, barrels of mash, kegs, etc., in Choctaw County.

Written reports of these activities filed by the appellant and Clemons were received in evidence.

It was their contention that their connection with Blackmon arose from their efforts as enforcement officers.

In rebuttal the State introduced evidence tending to show that several stills claimed to have been destroyed by the agents were at still sites which obviously had not been used for some time prior to the agents'

operations in Choctaw County; that no barrel staves, or broken glass or pottery were to be found at other sites where the agents claimed they had destroyed such equipment, etc.

The defense introduced a large number of character witnesses who testified to the good reputation of the appellant, and also numerous witnesses who testified to the bad reputation of Blackmon.

In rebuttal the State introduced several witnesses as to Blackmon's good reputation.

During the direct examination of State's witness Blackmon he identified a keg which he testified was given to him in his yard by "Mr. Clemmons and them" on the night of 12 January 1956. At the same time he was given some copper pipe, some buckets, and some chops by these parties. He knew the keg to be one in which he had hauled water for Nathaniel Roberts. The Sheriff of Choctaw County later "got" this keg, the testimony not showing how the keg came into the sheriff's possession.

Nathaniel Roberts was called as a witness for the State, and we excerpt the following from the record in connection with this witness' testimony:

"Q. Do you know this defendant over here, Mr. Patrick? A. No, sir, I don't know him directly.

"Q. Have you ever seen him before? A. It appears to me I have, but I would not be for sure.

"Q. Take this keg and look at it and tell this jury if you have ever seen it before. A. Yes, sir.

"Q. Where did you see it? A. At my home.

"Q. Did you lose this keg, or what happened to it? A. They taken it from the house.

"Q. Who are you talking about? A. Those men whoever it was there. I don't know them directly.

"Q. How many men was it? A. There was two of them.

"Q. What size were they? A. I wouldn't know directly. They were pretty fair size.

"Mr. Thompson: We object. That doesn't have anything to do with this defendant.

"Judge Pelham: Sustain the objection. I will leave in that it was his keg and some men took it.

"Q. Did they have on guns? A. Yes, sir.

"Did you have any whiskey in that keg? A. No sir.

"Q. What did you use it for? A. It was a water keg.

"Q. Did you ask them to leave the keg? A. Yes, sir.

"Q. What did they say?

"Mr. Thompson: Object. That is irrelevant, incompetent and immaterial unless he knows who they were.

"Judge Pelham: Sustain the objection.

"Q. The two men who were there took your keg? A. Yes sir.

"Mr. Gilmore: We offer the keg in evidence as State's Exhibit E.

"Mr. Thompson: We object. It hasn't been shown the defendant had any connection with that keg.

"Judge Pelham: Overrule.

"Mr. Thompson: Except.

"(Keg identified as State's Exhibit E)."

The clear import of Roberts' testimony is that two men robbed him of his keg. The only inference from the evidence that the jury could rationally draw is that Clemons and this appellant were the perpetrators of this separate and distinct crime.

The equivocal nature of Roberts' testimony fails in the required degree to identify

this appellant, or to identify anyone else for that matter, as to who were the men who had robbed Roberts of his water keg. For this reason the keg should not have been received in evidence, and the objection to its admission was timely made.

In its broader aspects the admission of the keg was erroneous, in that the evidence in connection therewith can only be deemed as inferring that the appellant and Patrick were guilty of a separate and distinct offense, that is robbery, whereas the offense for which the appellant was indicted and tried was that of transporting prohibited liquors in quantities of five gallons or more.

■ Ordinarily, evidence of other or prior offenses is not admissible. As with most broad general rules numerous exceptions have developed.

These exceptions are set out in Wharton's Criminal Evidence, Sec. 31, as follows:

"These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes."

The relevancy of the keg in evidence, with its accompanying evidence tending to show a separate and distinct offense of robbery, is too tenuous, if not nonexistent, in relation to the offense of transporting, etc., to furnish any grounds for the reception of the keg in evidence.

As before noted, the uncontradicted evidence shows that a case of Ancient Age whiskey was found in the agents car at the time of their arrest, being in addition to the twelve gallons of moonshine whiskey.

■ The evidence also shows that the appellant had purchased this bonded whiskey at a State store with money furnished by George Speigner, of Tuscaloosa, who had requested the appellant to obtain the whiskey for him, and deliver it to him in Tuscaloosa. We judicially know that at this time Tuscaloosa County was a dry county.

With this recapitulation of the evidence we excerpt the following from the cross examination of several of the defendant's character witnesses.

John Crowell:

"Q. In your opinion a law enforcement officer who would enter into a conspiracy with another person to violate the law of the State of Alabama, would that affect his character in your opinion?

"Mr. Thompson: If the court please, we object to that.

"Judge Pelham: Overrule.

"Mr. Thompson: We except.

"Q. Just answer yes or no. A. It is hard to answer yes or no, but I would say yes."

J. R. Prater:

"If you knew that J. W. Patrick and one George Speigner entered into a conspiracy to violate the law of the State of Alabama, would that affect your opinion as to his character?"

The defendant's objection to this question being overruled, the witness answered "No, Sir."

P. C. Jenkins:

"Q. Would it affect your opinion of an officer if he conspired to haul whiskey for a man into your county, which is a dry county?

"Mr. Thompson: We object to that question.

"Judge Pelham: Overrule.

"Mr. Thompson: Except.

"A. For bootleg purposes?

"Q. For any purpose. If he goes and brings whiskey into your county, which is a violation of the law, would it affect your opinion of him?

"Mr. Thompson: We object.

"Judge Pelham: Overrule.

"Mr. Thompson: Except.

"A. It depends on what he was going to do with it. If he got it for his own use and wasn't bootlegging it, it would not. ·

"Q. If you didn't know what he was going to do with it and he was bringing it in there, would it matter? A. It would if I thought he was selling it.

"Q. If he conspired with another man, if the man had been tipped off the officers were picking up people hauling whiskey into that county from Greene County and an officer entered into a conspiracy to bring whiskey into that county in violation of the law, would that affect your opinion of him? A. Yes, sir, that would be a little different."

It might be noted that several of defendant's other character witnesses were asked questions of similar import on their cross examination, but no objections were interposed to the questions. Their answers were conditional and evidenced confusion as to categorically answering the question.

The questions propounded to the character witnesses on cross examination were hypothesized upon the facts which formed a part of the alleged offense for which the appellant was on trial, and could have had reference only to the appellant.

As framed the questions sought to establish the appellant's reputation by particular acts. A witness to character, whether on direct, or cross, examination, is confined to a statement of general reputation in the community, and evidence of particular acts is inadmissible.

The rules governing the permissible limits of character witnesses are discussed at length in Mullins v. State, 31 Ala.App. 571,

19 So.2d 845. In this rather definitive opinion on this question the late Presiding Judge Carr collected and analyzed many prior decisions. A reading of the Mullins case will show that this case is well within its influence, and that the lower court erred in its rulings in the instances above excerpted.

Reversed and remanded.