286 So.2d 62

Clara LOWERY, alias

v.

STATE.

5 Div. 134.

Court of Criminal Appeals of Alabama.

Sept. 28, 1973.

Rehearing Denied Oct. 16, 1973.

Maye, Melton & Kent, Opelika, for appellant.

William P. Gray, Jr., Special Asst. Atty. Gen., Tuscaloosa, for the State.

TYSON, Judge.

The indictment by the Grand Jury of Lee County, Alabama, charged Clara Lowery with the first degree murder of James Lowery, her husband, by shooting him with a shotgun. The Jury's verdict and judgment found the appellant guilty of manslaughter in the first degree, and fixed punishment at five years in the penitentiary of the State of Alabama.

The State presented the testimony of Wanda Diane Bell, who testified that she lived in Smith's Trailer Park off the Columbus Highway in Opelika, Alabama. She stated that the appellant and her husband lived in the trailer on Lot No. 17, which was next door to the trailer in which she lived. She stated that on February 25, 1972, at about 2:25 in the afternoon, she heard a sound next door like a pipe bursting, and a few moments thereafter the appellant came around the trailer and knocked on her door. She requested that she be allowed to use her telephone. She overheard the appellant state, "Send the Police and the ambulance. I just shot and killed my husband . . . Mrs. Clara Lowery."

Mrs. Bell stated that the appellant told her that her husband had attacked her, choked her, and that she struggled with him, grabbed a shotgun, and in the struggle the gun went off. The appellant requested that she be allowed to remain at Mrs. Bell's trailer until the police arrived. Mrs. Bell further stated that there were deep scratches on appellant's right cheek, her face, and on her hand.

Lt. Houston Jackson of the Opelika Police Department stated that he went to Smith's Trailer Park on the afternoon in question and found Mrs. Lowery in a very emotional state at the Bell trailer; that he went next door to the Lowery trailer and found the body of James Lowery lying on the floor near the stove with what appeared to be a shotgun wound in his chest; that he felt his pulse and found that he had none; that he remained there until the body was turned over to the coroner for examination. He further stated that a twelve-gauge double barrel shotgun was on the floor in the Lowery trailer and that one shell had been expended. He further stated that on the left hand of the deceased was a pair of scissors.

Further investigation showed that six cans of beer were inside the trailer, four of which had been consumed. The officers noted the odor of alcohol on the breath of the appellant, though they did not believe her to be intoxicated.

Police Patrolman Gary Knight testified that the appellant was in a highly emotional state when he took her, first, to the Lee County emergency room, where she received a shot for her nerves, and then on to the Opelika Police Department. The officer stated that he did not know what kind of "shot" it was, but that Mrs. Lowery did tell him that she had had one beer.

State Toxicologist Richard A. Roper stated that he examined the body of the deceased, accompanied by Lee County Coroner Clyde Weldon, and after describing the wounds found on the body of James Lowery, further testified, "In my opinion, the cause of death of this individual was hemorrhage and shock, associated with a gunshot wound to the chest, which damaged or destroyed major organs and blood vessels." The Toxicologist further stated that from his examination of the body the wound was consistent with "number 4 lead pellet shot." Mr. Roper further stated that there was a trace of alcohol found in a blood sample of the deceased.

The State next presented a statement given to Opelika Detective Nick Abbett and Detectives Califf and Fred Davis at about 3:10 on the afternoon in question. They stated that before a "Miranda warning" could be given to the appellant, she blurted out, "I killed him, I killed him, I don't offer any defense." The officers

testified that they endeavored to calm her down and read to her the Miranda warning. Following that the appellant dictated a statement, which the officers wrote down and then read back to her, which she signed. The statement is as follows:

"This morning about 7:15 A. M., 2–25–72, James had to go to Auburn to put some sheetrock in a house and I went along with him. We stayed in Auburn till about 10:30 A. M., James got his check and we went by a 7–11 store in Auburn and James (Pete), I call him, stopped and got 6 beers and we went home, and was at home a long time. I drank one of the beers and I think Pete drank about 3 beers. We started talking about my daughter Annett, she was in school. I ask Pete if Annett could bring a boyfriend home to supper some night and he said he didn't care if me and Annett had boy friends and went to bed with them. I said, 'You know I don't have a boyfriend and Annett is a good girl.' Then, I said, 'Why do you talk like that.' He was sitting in the living room and we were fussing for a long time. He got a pair of my weaving scissors and said he was going to disfigure me. He hit me on the face two or three times and I went to the bedroom and got the shotgun but didn't put any shells in it. I went back in the kitchen and he had got up and we met at the table in the kitchen. I said, 'Stop,' and I had the gun up and pointed at Pete. I said, 'You cut that out.' He reached for the gun and pulled on it and it fired and he fell back and I ran out the door and put the gun down in the living room at the front door. I went next door to use a phone to call my sister-in-law and then I called the Police."

The appellant took the stand and testified that on the day in question she had gone with her husband to his job where he picked up a pay check, then went by a bank and cashed it; that they went by a 7–11 store and drank some beer, then went by a Jack's hamburger place and got some hamburgers. Appellant's daughter by a previous marriage was at school. Appellant stated that she and her husband bought some more beer and then went back to their trailer where she talked with him about letting her daughter have some friends over and cooking supper; that her husband became angry and stated that he was going to "fix me where no man would ever look at me," grabbed a pair of scissors, and cut her on the face. She stated that she tried to get these away from him and kicked him on the leg, which staggered him, and that she then ran into the bedroom. The appellant grabbed her by the hair, threw her on the bed, and started choking her. She stated that she struggled with the deceased, kicked him in the stomach, heard him groan, and drop to his knees. She stated that a shotgun was near the dresser and that she grabbed it and told him to stay away from her; that the appellant came toward her, grabbed at the gun, pulled the barrel, and as he did so the gun went off.

She further stated that the deceased had consumed almost three six packs of beer during the day.

The appellant presented a number of character witnesses, including one Louie Donald Cooper, who stated that he was an ex-husband of the appellant, and that on one occasion he had seen the deceased threaten to kill the appellant while they were at an American Legion club. On cross-examination by the District Attorney, and over objection of defense counsel, Mr. Cooper was asked the question, "Isn't it a fact, Mr. Cooper, that not only while ya'll were married, she not only threatened to kill you, but she told you she could kill you and get away with it," to which Mr. Cooper answered, "No."

I

This Court has carefully examined the record in the case at bar and finds that while the trial court did, at the request of appellant's counsel, exclude the trial jury in order for the court to make its determi-

nation of voluntariness of the appellant's statement in accordance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L. Ed.2d 908, that in our judgment there was not here a sufficient "pre-Miranda predicate" laid in order to admit Mrs. Lowery's statement.

From Duncan v. State, 278 Ala. 145, 176 So.2d 840, we find the rule thus stated as follows:

"The rule is that extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether or not a confession is voluntary and unless it so appears it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Phillips v. State, 248 Ala. 510, 28 So.2d 542; White v. State, 260 Ala. 328, 70 So.2d 624; Hines v. State, 260 Ala. 668, 72 So.2d 296; Goldin v. State, 271 Ala. 678, 127 So.2d 375; Smitherman v. State, 264 Ala. 120, 85 So.2d 427."

In examining the testimony of the two Opelika police officers, we note that Mrs. Lowery was taken to the emergency room of the Lee County Hospital and there "given a shot for her nerves"; that she had become hysterical when advised by the officers that her husband was dead, and was, according to the officers, in a highly emotional state, "very upset" when she arrived at the Opelika Police Department approximately one and one-half hours after the shooting; that tears were running down her cheeks, and in fact Mrs. Lowery blurted out, "I killed him, I killed him, I don't offer any defense," before the officers could read to her a Miranda type warning.

There is no testimony in the record whatsoever to show who administered the "shot" to Mrs. Lowery at the Lee County Hospital, nor what type of shot or its dosage other than the statement of one officer, "It was for her nerves." She was taken directly to police headquarters from the hospital after receiving this shot, and at that time her statement was given to the officers. We find this prejudicially erroneous as there is no showing by the State that she was in a lucid enough condition to have clearly understood her constitutional rights before signing the statement admitted in evidence against her. To the contrary, according to the testimony of the officers, it was clear that the appellant was still in a highly upset, emotional condition when they attempted to talk with her and took her statement. We believe this to be prejudicially erroneous under the authorities herein cited. We do not wish to be understood as saying that the statement in question was here "drug induced," but from the totality of the circumstances presented in this record, it is far from clear that the appellant understood the nature of her statement to the officers, and that such was voluntary under the circumstances. Edwardson v. State, 255 Ala. 246, 51 So.2d 233, and authorities therein cited.

II

We further find that the trial court erred in allowing the District Attorney to examine Mr. Louie Ronald Cooper, the former husband of the appellant, with reference to the specific details of a statement which appellant had allegedly made to Mr. Cooper. The rule governing the examination of a character witness is stated in Mullins v. State, 31 Ala.App. 571, 19 So.2d 845, as follows:

"It is a well recognized rule that character must be shown and established by evidence of general repute. This does not contemplate proof of specific conduct. Without question, a person's behavior becomes a basis upon which his associates, friends and neighbors must rely in appraising his character or reputation. The inquiry, however, should not be directed to some particular performance, but rather the resultant of the course of behavior as it impresses the community life of the person whose character is involved. This rule applies with equal force to both direct and cross examina-

tion of a character witness. The permission allowed to wide latitude in cross examination does not permit an infraction of the principle stated above. Moulton v. State, 88 Ala. 116, 6 So. 758, 6 L.R.A. 301.

"Confusion sometimes arises in distinguishing between the right to cross examine a witness who testifies to good character to ascertain his estimate of character as affecting his credibility and the prohibition against inquiring as to specific conduct. In the former inquiry it is complying with the rule for the opposing counsel to ask the witness if he has not heard of certain misbehavior which would tend to mitigate against the character of the person whose good repute the witness is seeking to uphold. This is allowed for the reason that an adversary has the right to test the accuracy, credibility and sincerity of a witness when the privilege of cross examination is exercised. However, care and caution should be employed by the primary court in applying this rule, because it is very easy to abuse the liberty and inject into the trial unfair and harmful issues that are foreign to the inquiries at hand. Morris et al. v. State, 25 Ala.App. 175, 142 So. 685.

"In recognition of the above stated principle and rule, Judge Bricken, presiding judge of this court, in the case of Jimmerson v. State, 17 Ala.App. 552, 86 So. 153, 154, said: 'The general rule is that character, whether good or bad, can only be proved by general reputation and evidence of particular acts or conduct is inadmissible, both on the direct and cross-examination, though in the latter a greater latitude is allowed than in the former; and, while a witness may sometimes on cross-examination be asked irrelevant questions to test his accuracy, veracity, or credibility, even on cross-examination the inquiry must be kept within bounds, and it is not permissible for the inquiry to extend to particular acts or to isolated facts. Thompson v. State,

100 Ala. [70], 71, 14 So. 878. In other words, on the cross-examination of a witness who has testified as to the general good character of defendant, it is permissible to ask the witness if he had not heard it reported in the community that the defendant had committed certain unworthy acts, naming them, but this even is not allowed for the purpose of affecting the character of the defendant, but as evidence affecting the credibility of the witness testifying to good character. Carson v. State, 128 Ala. 58, 29 So. 608; Williams v. State, 144 Ala. 14, 40 So. 405; Smith v. State, 103 Ala. 57, 15 So. 866. Such examination is also permitted for the purpose of either showing that the witness was mistaken in his estimate, or for shedding light on his estimate of such character. Stout v. State, 15 Ala.App. 206, 72 So. 762.' "

■ It is clear that the question here asked of Mr. Cooper was of the character which has been condemned by the authorities as being prejudicially erroneous. See Kelly v. State, 17 Ala.App. 577, 88 So. 180; Jimmerson v. State, 17 Ala.App. 552, 86 So. 153; Gray v. State, 21 Ala.App. 409, 108 So. 658; Bedingfield v. State, 24 Ala.App. 398, 135 So. 656; Morris v. State, 25 Ala. App. 175, 142 So. 685; Vinson v. State, 247 Ala. 22, 22 So.2d 344; Williams v. State, 250 Ala. 549, 35 So.2d 567.

We cannot say that the negative answer by the witness Cooper cured the error here shown. Gray v. State, supra, and cases cited.

■ Moreover, the erroneous cross-examination of the character witness Cooper was underscored by further allowing Officer Gary Knight, on rebuttal, to testify as to the details of his conversation with Mr. Cooper pertaining to the appellant and stating over defense counsel's strenuous objection that Mrs. Lowery had stated to him (Cooper) that she could "kill him and would kill him and get away with it." [Transcript pp. 173–176] Clearly, the details of such alleged statement being

hearsay could not be shown for the purpose of affecting the character of the defendant on trial. Patrick v. State, 39 Ala. App. 240, 97 So.2d 589.

 Moreover, the District Attorney was allowed to argue this matter over objection of defense counsel to the Jury. Such was also erroneous. Cases herein cited.

We pretermit consideration of other assignments of error because of our holding as herein set forth. For the reasons shown, the judgment of conviction is due to be reversed and the cause is hereby remanded.

Reversed and remanded.

CATES, P. J., ALMON and DeCARLO, JJ., concur.

HARRIS, J., concurs in result.