312 So.2d 71

**Eugene SEXTON**

v.

**STATE.**

**3 Div. 323.**

Court of Criminal Appeals of Alabama.

April 22, 1975.

Frank W. Riggs and Von G. Memory, Montgomery, for appellant.

William J. Baxley, Atty. Gen, and Brent Thornley, Asst. Atty. Gen., for the State.

BOOKOUT, Judge.

The appellant was indicted by the Grand Jury of Montgomery County on February 12, 1974, on a charge of carnal knowledge of a girl under the age of twelve. He was convicted on June 11, 1974, by a Jury and punishment was fixed at ten years.

Mary Crooms, the State's first witness, testified that she was twelve years old on the date of the trial and that she had sex with the appellant three or four times during the previous summer. She identified the appellant in the courtroom. She stated that one time when she had sex with him, they went by the B & B Grocery Store in north Montgomery. On that occasion, she stated the persons present were three white men, which included the appellant, and one black man, the witness, Eloise Willis, Laura Philips and Catherine Larry, who is known as Black Cat. The testimony established that the act took place behind the B & B Grocery in a room with two small beds. The witness testified that the appellant chose her and a man named Fate Thomas chose Black Cat and that the act took place with the four of them in the room together with two separate beds. She stated that the appellant paid her $5.00 after the act.

Mary Crooms further testified that she went out with the appellant on Air Base Boulevard and also had gone with him to the City Dump.

On cross examination, counsel for the appellant attempted to impeach the witness by showing that during the preliminary hearing, she testified that she had had sex with the appellant only one time, on October 18, 1973, at about 6:00 or 6:30 in the evening. Counsel for appellant made a showing through the transcript from the preliminary hearing that the witness, on October 18, 1973, had sex with Fate Thomas and a Shirley White had sex with the appellant. On that occasion, she stated the group went to the City Dump in a white Chevrolet automobile similar to the one depicted in defendant's Exhibit No. 1.

On redirect examination, the witness stated that she had sex with the appellant on times other than October 18, 1973.

A certified copy of the birth certificate of Mary Crooms was admitted into evidence as State's Exhibit No. 1 without objection. That Exhibit showed the witness to have been born November 8, 1961.

The State next called Catherine Larry as a witness. She stated that her nickname was Black Cat and that she knew Mary Crooms. She identified the appellant in the courtroom and testified that she saw the appellant have sex with Mary Crooms in a trailer behind B & B Grocery on a Saturday night in mid-July, 1973. She said the trailer door was not locked, and she could see the sex act take place and upon completion, she and Fate Thomas went in and had sex. She saw the appellant give Mary Crooms $5.00.

Harvey Faulk testified that he was employed by the Sanitation Department at the Montgomery City Dump and had known the appellant for six years. He had seen the appellant drive in the City Dump with a young black girl in the car occasionally.

Homer Williams testified that he worked at the City Dump for some two years. He said that he had seen the appellant come in the City Dump on Saturdays and had seen him come by the City Dump with black girls several times.

Detective Luther M. Mears testified out of the presence of the jury. He stated that he was a Montgomery City Detective with the Youth Aid Bureau. He stated that on October 24, 1973, after reading appellant his rights and the *Miranda* warning, and after both the appellant and the witness talked by telephone with the appellant's attorney, the appellant gave him a statement. He said the appellant admitted having sexual relations with Mary Crooms three of four times, that the last time was October 18, 1973, at approximately 7:30 P. M. at the City Dump, and that he paid her $2.00 or $3.00. He testified that appellant acknowledged knowing Mary Crooms to be eleven years old at the time. On redirect examination, the witness said the appellant told him he had also been out to a trailer

behind B & B Grocery, however, the witness did not say whether the appellant related anything that had occurred there.

Captain P. L. Burton of the Montgomery Police Department testified out of the presence of the jury. He testified that he was a Lieutenant with the Montgomery Police Department on October 24, 1973, when the appellant was brought to his office by Detective Cunningham. He said the appellant was informed at that time that he could call his attorney, and he called attorney Elno A. Smith, Jr. Captain Burton said he spoke to Mr. Smith on the telephone, informing him that the appellant had been brought to his office on a charge of carnal knowledge and that the Detective Bureau was investigating a murder charge.

Captain Burton said Mr. Smith told him he had advised his client to go ahead and give the police the information. Captain Burton said he and Mr. Smith then discussed the extent of the carnal knowledge case, and the witness told Mr. Smith at that time that he did not know the full extent of it. The witness said he never told Mr. Smith that the appellant would not be charged with carnal knowledge.

Detective J. C. Cunningham was called on voir dire examination by the appellant and testified outside the presence of the jury. He testified that he had gone to the appellant's home in October of 1973 around ten o'clock one morning and brought the appellant to the police station to talk with him about a murder case. The appellant was advised of his rights and the police questioned him at length about a girl that had been murdered and about any other girls that he may have known. The subject of the murder investigation evolved from a prostitution ring of young black girls operating in Montgomery. The murdered girl was a friend and companion of Mary Crooms and others. Appellant had denied to Detective Cunningham that he had anything to do with any of the girls. Detective Cunningham turned the appellant

over to the Youth Aid Bureau around noon for questioning, but did not know what the appellant told those officers.

The appellant called Charles A. Formby to testify in the presence of the jury. Mr. Formby stated that he was a free lance court reporter who prepared the transcript of the preliminary hearing in Municipal Court when Mary Crooms had testified. He said Mary Crooms testified that the appellant had sex with her and a Shirley White at around 6:00 or 6:30 P.M. on October 18, 1973. Counsel for the appellant offered the entire transcript of the preliminary hearing into evidence, but the trial court refused to admit it.

The State recalled Captain Burton to the stand who testified in the presence of the jury. His testimony was essentially the same as earlier given outside the presence of the jury.

Detective Luther Mears was recalled to testify on behalf of the State in the presence of the jury and without objection related the appellant's confession to the jury and testified to essentially the same facts as before. The State then rested its case.

Detective J. C. Cunningham was called by the appellant as a hostile witness. He testified to essentially the same facts as before. Shirley White was called as a witness for the appellant. She said that she, Mary Crooms, and the appellant went out together in October, 1973, and that Mr. Sexton did not have sex with Mary Crooms.

The appellant's wife was next called as a witness. She stated that she remembered October 18, 1973, that on that date her husband left work early for a doctor's appointment and returned home around 5:30 P.M. She said he brought some medicine home with him, sat down and looked at the news, and did not go out that night at all.

The appellant then took the stand to testify in his own behalf. He said he was employed by the City Sanitation Department in October of 1973 and drove a garbage truck.

The appellant stated that he had left work around 3:30 P.M. on October 18, 1973, and went to the office of Dr. Farris Martin for treatment. The receipt for a $5.00 payment to Dr. Martin dated October 18, 1973, was admitted into evidence. After leaving the Doctor's office, he went to a drug store and had a prescription filled and returned home around 5:30 P.M. He stated that on arriving home he watched television and did not go out that night.

The appellant said that Detective Cunningham came to his home on October 24, 1973, to talk to him about a murder charge and took him to the police station. After questioning on the murder charge, he was taken to the Youth Aid Bureau where his rights were read to him, and he requested to call his attorney. He said that Lieutenant Burton talked to his attorney on the telephone in his presence and told the attorney that the appellant was not going to be charged with any of the sex charges, as he was interested in the murder charge. The appellant stated that after this was told to his attorney on the telephone, his attorney then talked to him and told him to go ahead and make a statement to the police. He testified that he told the police he did not have anything to do with Mary Crooms. He said that he had never had sex with Mary Crooms and that he owned a blue 1966 Chevrolet in October of 1973. On cross examination, he stated he owned a white Chevrolet at an earlier time, but sold it July, 1973. The appellant denied that he had made any statement of guilt to the police and emphatically denied having sex with Mary Crooms or any of the other girls questioned about.

Attorney Elno A. Smith then called himself to the stand and was questioned by an associate. He testified that on October 24, 1973, around lunch time he was telephoned by the appellant who stated he was at the City Jail and was being questioned by the police. Mr. Smith asked then to speak to

the man in charge, and Lieutenant Burton of the Youth Aid Bureau came on the telephone. He asked what the appellant was being questioned on and was told that the police were investigating a murder charge which had been written up in the newspapers and which Smith thus knew about.

The witness then stated that he asked if the appellant had been charged, and was told that he had not been, but there were some other things the police wanted to question the appellant about. He said he asked if the police were going to charge the appellant, "with any of this?," and Lieutenant Burton said, "No." He stated he then asked to speak with his client and told him to cooperate a hundred per cent with the police and tell them anything they wanted to know, because they were not going to charge him. The witness stated that he was leaving town for a vacation at the time he received the call and did not know that his client had been charged in the case until he returned to town a week later. At the end of his testimony, Mr. Smith moved to exclude the earlier testimony of Detective Mears on the ground that there was some hope of reward or immunity granted the appellant. The court overruled such motion.

The appellant next called twelve character witnesses and then the State recalled Detective Mears to the stand on rebuttal. The District Attorney stated that since the appellant had testified that he had never had sex with Catherine Larry, for impeachment purposes, the State was now asking Detective Mears if the appellant had made any reference to Catherine Larry in the statement he had given to the witness. The witness stated that the appellant said he knew Catherine Larry as Black Cat; had known her for three or four years; that she was thirteen when he first knew her; and that he had been having sex with her. On cross examination and on redirect examination, the witness stated that the appellant had told him he had been having sex with Mary Crooms also, once at the City Dump and some in a

trailer behind the B & B Grocery. The State rested its case and the attorneys began their summations to the jury. There was no motion to exclude the State's evidence and no exception to the court's oral charge. The jury returned a guilty verdict and fixed the sentence at ten years. The appellant filed a motion for a new trial on June 25, 1974, which was lawfully continued from time to time until overruled on October 17, 1974. Notice of appeal was filed that date.

I

During the trial, Mr. J. C. Hartsell was called as a character witness on behalf of the appellant. He testified that the appellant had good character and a good reputation in the community in which he lived. On cross examination, the following occurred:

"Q. (By Mr. Thomas) All right. Now let me ask you this: would you think a man had good sense who would take an eleven year old girl out and have sex with her; would you think anybody had good character if they did that?

"MR. SMITH: We're going to object to this, Your Honor.

"THE COURT: No, cross examination. I'll allow him to answer it.

"Q. (By Mr. Thomas) Would you think that he had good character if he did that?

"A. Well, I wouldn't believe he would."

Throughout the testimony of the appellant's various character witnesses, similar questions were asked. Either no objections were made, or upon objection, no answer was given, or the court sustained an objection; however, the appellant's objection to the above question was overruled by the trial court, and the witness was allowed to give an answer.

The Alabama Court of Appeals in 1944 rendered a key decision relative to the

question in controversy. In Mullins v. State, 31 Ala.App. 571, 19 So.2d 845, Judge Carr rendered a lengthy and scholarly opinion dealing directly with the permissible bounds of cross examination of a character witness. That case has been cited in many other decisions by this Court and by the Supreme Court of Alabama, and we again invite attention to its holding in the instant case.

*Mullins,* reiterated that it is a well recognized rule that character must be shown and established by evidence of general repute, therefore proof of specific conduct is not permissible for the purpose of showing the character of the accused or for cross examining a character witness. *Mullins* further holds:

" . . . Without question, a person's behavior becomes a basis upon which his associates, friends and neighbors must rely in appraising his character or reputation. The inquiry, however, should not be directed to some particular performance, but rather the resultant of the course of behavior as it impresses the community life of the person whose character is involved. This rule applies with equal force to both direct and cross examination of a character witness. The permission allowed to wide latitude in cross examination does not permit an infraction of the principle stated above.

. . .

" . . . In other words, on the cross-examination of a witness who has testified as to the general good character of defendant, *it is permissible to ask the witness if he had not heard it reported in the community* that the defendant had committed certain unworthy acts, naming them, but this even is not allowed for the purpose of affecting the character of the defendant, but as evidence affecting the credibility of the witness testifying to good character. . . . " (Emphasis supplied.)

Questions asked by the prosecution during the *Mullins* trial and considered by the court were as follows:

" . . . 'Assuming that this defendant had gone to the home of another man at night time and shot a pistol around in the room and a young lady ran out by him and he ran out after her and shot the pistol again and then he turned around when a man asked him what was the matter—he turned around and shot this man, would you say that he was a man of good character?

" 'Assuming these facts to be true: that Mr. Mullins put a pistol in his pocket in the night time and went to the home of a citizen of Dale County and there went into the kitchen where the family were (sic), one girl whose life he had threatened, and pulled out a pistol and fired twice in the kitchen and when that girl ran out the kitchen door he fired again in that direction and when the head of the house asked him, "Mr. Mullins, what in the world is the matter?", he turns and shoots him and kills him, do you say that that man is a man of good character for peace and quietude?' "

The Court of Appeals held those questions to be improper and to be cause for reversal. The opinion in the *Mullins* case, likewise, sets out other questions which would be improper cross examination of a character witness:

"From the opinion in Harmon v. State, 22 Ala.App. 288, 115 So. 67, we quote the following: 'After Mr. Mohr had qualified and testified to the good character of defendant, the solicitor, over proper objection and exception, was allowed to ask the witness Mohr, on cross-examination: "Would you think a preacher who would leave his sick wife home on New Year's night and go out to a woman's house and stay with a woman, with a half pint of liquor, would have good character?" To which the witness answered, "No." Motion was made to exclude the answer.'

"The court observed: 'The testimony of the witness Mohr was limited to the general character of the defendant. The question asked on cross-examination was as to particular acts and conduct, and under the evidence here could have had reference only to the defendant. The question is without the rule laid down.'

.    .    .    .    .    .

"In Chiles v. State, 26 Ala.App. 358, 159 So. 700, the defendant was on trial for larceny of two bales of cotton. J. H. Phillips, defendant's witness, testified: 'Have known Jim Chiles about twenty-eight years. His character is good.' On cross examination the solicitor interrogated him as follows: 'Would you tell this jury that a man that is a cotton thief is a man of good character?' The court held the latter question improper and highly prejudicial."

Other questions of similar import were cited in the *Mullins* opinion, supra, which had been held to constitute reversible error.

In the case of Thompson v. State, 39 Ala.App. 569, 105 So.2d 146, the following question was held to be improper and properly excluded:

"  .   .   .  'If you know he spent his time in the neighborhood and visited and consorted with colored people would you still say he was a man of good reputation?' "

In the case of Patrick v. State, 39 Ala. App. 240, 97 So.2d 589, the *Mullins* decision, supra, was cited as authority for reversal due to improper examination of a character witness by use of the following questions and others of similar import:

" 'If you knew that J. W. Patrick and one George Speigner entered into a conspiracy to violate the law of the State of Alabama, would that affect your opinion as to his character?' "

.    .    .    .    .    .

" 'Q. Would it affect your opinion of an officer if he conspired to haul whiskey for a man into your county, which is a dry county?' "

The Alabama Supreme Court in Vinson v. State, 247 Ala. 22, 22 So.2d 344, wrote:

"The opinion of the Court of Appeals discloses that the solicitor was permitted to cross-examine the character witnesses of the defendant as follows: 'Say he (defendant) was running a place,—we will say down here in the basement of the court house selling whiskey in violation of the law where he was selling any kind of whiskey, would you say his character was good?'

"The law is correctly stated in the opinion of that court that this type of cross-examination was not permitted under our decisions. A character witness may be impeached, or his credibility tested on cross-examination, by being asked if he had not heard of specific acts of bad conduct of defendant, but he may not be interrogated as to the fact of such particular acts. Andrews v. State, 159 Ala. 14, 48 So. 858; Mullins v. State, 31 Ala. App. 571, 19 So.2d 845; Jones v. State, 31 Ala.App. 504, 19 So.2d 81."

In the instant case, the character witness for the appellant was not asked on cross examination *if he had not heard of specific acts of bad conduct* of the appellant. The question propounded here had reference to particular acts, predicated upon facts testified to by the State's witnesses and, therefore, pursuant to the authorities cited above, the trial court erred in overruling the appellant's objection to the question. See also: Lowery v. State, 51 Ala.App. 387, 286 So.2d 62 and Houston v. State, 50 Ala.App. 536, 280 So.2d 797.

II

We have reviewed the other assignments of error raised by the appellant. There is

no probability that the same objections will occur on a retrial and it is, therefore, unnecessary to rule on those points.

For the error indicated, the judgment of conviction is reversed and the cause remanded for new trial.

Reversed and remanded.

All the Judges concur.