The indictment charged William Thomas Willis with the first degree murder of his wife, Judy Sandra Bradford Willis. The jury found the appellant guilty of murder in the second degree and fixed his punishment at twenty years imprisonment. The trial court entered judgment in accordance with this verdict. The appellant's motion for new trial was denied.
On November 30, 1975, Judy Sandra Bradford Willis died after being shot with a .243 Sako rifle which fired while in the hands of her appellant-husband. The appellant claimed in his testimony at trial, and in a statement which he had given to the Jackson County Sheriff's Department shortly after the shooting incident, that his rifle had malfunctioned and fired accidently. The jury found otherwise.
The evidence revealed that the appellant had planned a 4:30 a.m. deer hunt on the morning in question, but that he had temporarily postponed his hunting trip after he awoke that day to what he indicated was an unfavorable deer hunting condition, "blowing wind." However, around 8:00 a.m., the wind had subsided somewhat, and the appellant decided to proceed with his hunting plans. The appellant requested that his wife get up and cook his breakfast, which she did reluctantly while the appellant gathered his hunting gear. Moments later the fatal shot was fired. The appellant's account at trial of what transpired was as follows:
 "Q. What part of the trailer was the gun in before you picked it up that morning to go out?
"A. It was sitting in the corner beside the couch.
 "Q. Near the kitchen, near where your wife was working?
 "A. Like I said, the kitchen is here and the living room right about here beside it, maybe fifteen or twenty feet from where the gun was standing.
 "Q. Is that the place from which you picked up the gun?
"A. Right.
 "Q. All right, and did you walk over there and get it by itself, or did you get some other piece of equipment with the gun at that time?
 "A. I kept all of it; I had my clothes on the couch; like the vest and my hat, I put on and picked up the vest and the gun.
"Q. What did you do then?
 "A. Well, I started out the front door. "Q. All right.
"A. And, —
"Q. Did you arrive at the front door?
"A. Yes, I had the front door open.
 "Q. All right, what did you do after you opened the front door?
 "A. Well, I worked the bolt on the rifle and looked; and, well, I forgot what he called it, but I call it the chamber.
"Q. The chamber?
"A. Yeah.
"Q. All right, where was the vest at this time?
"A. It was in my hand right here.
"Q. All right.
"A. And I didn't see anything in it.
 "Q. You say you didn't see anything in it. What do you mean by that?
"A. I didn't see any shells in the gun.
 "Q. All right, how far were you from a light in the trailer at that time, overhead light, or post or floor lamp, or anything, or any kind of lamp?
 "A. There was a light in the kitchen over the sink, I believe.
 "Q. All right, how bright was it outside at that time?
 "A. Well, it was cloudy and windy, the best I can remember.
"Q. All right, you looked down in the chamber? Go on.
 "A. And as I started to pull the bolt back up, she spoke to me; and as I turned around, she had turned, too, standing facing me; and as I pulled the bolt up and snapped it together, the gun went off. *Page 804 
"Q. Did you pull the trigger?
"A. No, sir.
 "Q. The gun fired without your pulling the trigger, is that what you're saying?
"A. Yes, sir.
"Q. Then what happened?
 "A. Well, of course, the bullet struck her and she fell and I, on impulse, threw the gun out the door, kind of reflex, just threw it; and naturally, I run to see what I could do for her."
When the above portion of the appellant's trial testimony is contrasted with his oral statement given to Officer Tubbs and Coroner Henshaw only hours after the shooting incident, no material conflicts arise between the two. Officer Tubbs recited the pertinent content of the appellant's November 30th statement as follows:
 "A. Judy Willis, the deceased, making biscuit dough in a glass bowl in the kitchen area; and during this time, he was bringing his gun outside to put it in the car to go on this hunting trip when she, according to Mr. Willis, made some indication to him to wait and eat breakfast since he had already gotten her up, before he left; Mr. Willis said that he raised the rifle and pointed it towards Judy Willis and it went off. He said he did not touch the trigger, that he held the gun between the stomach and chest height and that he had just checked the gun and said it was not loaded.
"Q. Did he indicate how he had checked the gun?
 "A. He unbolted the gun and saw the gun was clear of any ammunition.
"Q. This was what he told you he did?
"A. He was sure of this.
 "Q. Okay, did he indicate whether or not the gun did, in fact, go off or not?
 "A. He indicated that the gun fired; he was holding the gun and it was an accident.
 "Q. Okay, what did he say he did with the gun, if anything?
 "A. He slang the gun outside the front trailer residence door approximately fifteen feet out in the grass."
However, contained in the record was evidence of serious prior difficulties between the appellant and his wife. On one occasion the appellant was arrested in Tennessee for feloniously assaulting his wife. There was evidence presented which revealed that as a result of one beating inflicted by the appellant, his wife required hospitalization and that the appellant had stated to his wife on another occasion in the presence of several witnesses that, "Judy, I could kill you and I wouldn't serve three to five years."
The appellant admitted that his wife was afraid of him and that they "had had difficulties" for a long time. The appellant also testified that it was not uncommon for him and his wife to point guns at each other, commenting that they "had done it a thousand times," and further acknowledged that this time, "it just happened to go off. . . ." The appellant's rifle, which he thought was unloaded, was found with one spent cartridge in the firing chamber and four rounds of live ammunition in the clip.
 I
The appellant contends that the trial court erroneously allowed Officer Tubbs and Coroner Henshaw to relate to the jury the substance of his oral statement which he made to them at North Jackson Hospital shortly after the incident in question since at the time he made this statement, he was heavily sedated, thus rendering anything he might have said involuntary and inadmissible.
In accordance with Jackson v. Denno, 378 U.S. 368,84 S.Ct. 1774, 12 L.Ed.2d 908, an evidentiary hearing was held outside of the jury's presence to determine the voluntariness of the appellant's statement. During this hearing, it was established that the appellant had been given an injection of Thorazene, and later an injection of Vistararl at North Jackson Hospital prior to the making of his statement.
Dr. Joe E. Hall, the appellant's physician, testified that he prescribed the medication in order to tranquil the extreme nervous and agitated condition his patient demonstrated *Page 805 
at the hospital on the morning in question. Dr. Hall stated that the effect these drugs would have on a man's ability to relate "what happened" in response to questioning would vary greatly from patient to patient, but that the drugs' usual effect produced drowsiness to a degree that the patient might appear "somewhat intoxicated." Dr. Hall testified that he did not observe the appellant after these shots had been administered, and therefore could not state with certainty what actual effect, if any, they had on his patient's ability to answer questions concerning Judy Willis' death.
Officer George Tubbs, the investigator for the Jackson County Sheriff's Department, testified that he interviewed the appellant in a "secluded" room at North Jackson Hospital with Coroner Henshaw and a Deputy Adams present. Officer Tubbs stated that the appellant was brought to the room in a wheelchair, and that he was not advised by the attending nurses that the appellant was under sedation. Officer Tubbs stated he did not make a personal inquiry into the matter since the appellant did not appear to him to be under the influence of any drug. Officer Tubbs testified that the appellant was advised of his Miranda rights, that appellant indicated he understood his rights, and that the appellant at no time was threatened, offered any reward or hope of reward, or offered any inducement to make a statement. Officer Tubbs indicated that the appellant had no difficulty in understanding questions, and that the appellant spoke calmly and deliberately throughout their fifteen minute conversation. Officer Tubbs further noted that the appellant left the interrogation room without the aid of a wheelchair.
A trial court's determination of the effect tranquilizers or sedatives have on the voluntariness of a defendant's statement is based on the same criteria as that used to determine the voluntariness of a statement made by one under the influence of alcohol. Vinzant v. State, 28 Ala. App. 220, 180 So. 736. This Court, per Harris, J., in Carter v. State, 53 Ala. App. 43,297 So.2d 175, held:
 ". . . The law is clear that proof of intoxication amounting to mania or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words renders a confession so made by him inadmissible, but a lesser state of intoxication will not render the confession inadmissible. The voluntariness of an alleged confession is a question of law for the court and should be decided by the trial court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed unless it appears contrary to the great weight of the evidence or is manifestly wrong. Stewart v. State, 49 Ala. App. 681, 275 So.2d 360."
Thus, the established rule is that intoxication short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not in itself render a statement inadmissible. Bedingfieldv. State, 47 Ala. App. 677, 260 So.2d 408; Anderson v. State,45 Ala. App. 653, 235 So.2d 902; Woods v. State, 54 Ala. App. 591,310 So.2d 891; Daniels v. State, 53 Ala. App. 666,303 So.2d 166, and authorities therein cited.
Once a finding is made by the trial court that a defendant's statement was voluntarily and freely given, the fact of intoxication is left with the jury to consider in their determination of whether such statement is entitled to weight and credibility. Anderson v. State, supra. Compare Lowery v.State, 51 Ala. App. 387, 286 So.2d 62, cert. denied 291 Ala. 787, 286 So.2d 67, and authorities cited therein.
The evidence, which revealed the facts and circumstances that attended the taking of the appellant's statement, was sufficient for the trial court to establish the statement's voluntariness. See Jones v. State, 292 Ala. 126, 290 So.2d 165.
Supportive of, but not necessary to, our holding that the trial court made no error in determining that the appellant understood *Page 806 
the meaning of his words at the time he gave his statement to Officer Tubbs and Coroner Henshaw is the fact that appellant's testimony at trial was substantially the same as that used by him in the statement in question. See Jones v. State,50 Ala. App. 36, 276 So.2d 621, and cases therein cited.
We have carefully considered the entire record, as required by Title 15, Section 389, Code of Alabama 1940, and find no error therein. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur.