[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1043 
Windell Lane Sexton was convicted of the first degree rape and first degree sodomy of his five-year-old daughter. He was sentenced to two concurrent terms of twenty-five years' imprisonment. He raises seven issues on this appeal from those convictions.
Four witnesses testified for the State: the prosecutrix; Dr. Judi Jehle, the gynecologist who examined the child three months after the alleged rapes and sodomies; Dr. Guy Renfro, the clinical psychologist who treated the prosecutrix; and Richard Vass, the prosecutrix's seventeen-year-old half-brother.
The prosecutrix's testimony established the elements of rape and sodomy. In addition, the child testified that her father urinated and defecated on her, and then made her eat his feces. She testified that she threw up and that he made her "eat the throw up." She testified that these incidents occurred daily for a period of several months but she did not tell her mother for some time.
Dr. Jehle testified that the child had a perforated hymen but found no evidence of tearing or scarring. She stated that the child's "vaginal introitus was several centimeters wide. I was able to admit my index finger without any problems but I doubt that there could have been anything a whole lot larger than that that would have been able to, that would have penetrated the vaginal vault." Dr. Jehle testified that, although it was unusual for a girl so young to have a perforated hymen, she was unable to "arrive at a conclusion that there had been any trauma" since her examination was done three months after the alleged incidents took place. She stated that it was possible that masturbatory behavior could perforate the hymen but concluded it was "very unlikely" that "rubbing the vagina against a hard wooden object" would cause the hymen to tear.
Dr. Renfro's testimony is summarized in Part III of this opinion. Richard Vass testified that the defendant was alone in the house with the prosecutrix for a week while the girl's mother was in the hospital. *Page 1044 
On several occasions he heard the prosecutrix tell the defendant "not to touch her or to get out of the room." Once she said, "Daddy, don't touch me in my private place." During the time in question he also saw the prosecutrix rubbing her pelvic area on a china cabinet.
The defendant testified in his own behalf and denied the charges against him. He called Kathryn Sexton, his former wife and the mother of the prosecutrix, to testify. Mrs. Sexton stated that she disapproved of the "body games" played by the defendant with the prosecutrix and scolded the defendant for "overstimulating" the child. The defendant also called numerous character witnesses who testified to his good reputation for truthfulness.
 I
First, the defendant argues that the State improperly bolstered the credibility of the prosecutrix when the female assistant district attorney sat in the witness chair with the child during her testimony. The State maintains that the prosecutor's conduct was designed merely to reassure a frightened child in order to enable her to testify.
While we agree with the State that "it is entirely reasonable and understandable that a five-year-old little girl would need someone there in a comforting or reassuring role," appellee's brief at 23, the prosecutor is not the appropriate person to assume that role. "It is, of course, never proper for the prosecuting attorney . . . to state . . . their personal belief in the guilt . . . of the accused. To do so is to place before the jury for consideration the lawyer's own character and credibility, which is no part of any judicial proceeding."Adams v. State, 280 Ala. 678, 680, 198 So.2d 255, 257 (1967). See also Tarver v. State, 492 So.2d 328 (Ala.Cr.App. 1986);Waldrop v. State, 424 So.2d 1345, 1346-48 (Ala.Cr.App. 1982).
 " 'Attempts to bolster a witness by vouching for his credibility are normally improper and error.' United States v. Ellis, 547 F.2d 863, 869 (5th Cir. 1977). The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. United States v. Roberts, 618 F.2d 530, 537 (9th Cir. 1980) (citing Ellis, supra). This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. See United States v. Lamerson, 457 F.2d 371, 372 (5th Cir. 1972); Gradsky v. United States, 373 F.2d 706, 709-10 (5th Cir. 1967). Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony. See United States v. Brooklier, 685 F.2d 1208, 1218 (9th Cir. 1982) (explaining United States v. Roberts, 618 F.2d 530
(9th Cir. 1980))." United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
Because of the possibility that a jury might interpret the prosecutor's action as indicating a personal belief in the credibility of the witness or the guilt of the accused, it is generally improper for the prosecutor to sit with a witness during her testimony. If, because of age, timidity, or frailty, a witness requires aid in order to testify, that aid should be rendered by someone other than the prosecuting attorney.
Although we do not condone the action of the State's attorney here and we caution prosecutors to refrain from similar actions in the future, we do not find that the trial court's overruling of the defendant's objection to this practice constituted reversible error under the circumstances of this particular case. There is an indication that the five-year-old witness was reluctant to testify at trial. The objection was only general: "I would like to impose an objection to Miss Brooks [the assistant district attorney] sitting with the witness on the witness stand." The trial judge was in the best position to determine what, if any, probable effect this action would have on the jury. "The trial court is vested with discretion in the conduct of a trial and *Page 1045 
appellate courts will not interfere therewith unless it clearly appears that there has been an abuse of discretion."Townsell v. State, 255 Ala. 495, 498, 52 So.2d 186, 189 (1951).
 "Obviously, the examination of witnesses, on all trials, is for the purpose of eliciting the truth. They are sworn to speak the truth, the whole truth, and nothing but the truth. In attaining this end, a very large discretion must be allowed the presiding judge; and this the more particularly, where the witness is a mere child, and a female, under circumstances which are unaccustomed and greatly embarrassing to her. In such a case, if the age of the witness does not exceed eight years, this discretion will not be reviewed, unless there are fair reasons to believe that the witness, by such an examination, has been led into error." Wade v. State, 50 Ala. 164, 166
(1874) (citations to authority omitted).
 II
After the defendant's conviction, defense counsel learned that the prosecutrix had been "fearful" and "reluctant" to testify, and had been promised a "surprise" by a Department of Human Resources social worker if she would "be brave" and "tell the truth" in the courtroom. Following her testimony, the child ran up to the social worker in the hall outside the courtroom and asked for her "surprise." The prosecutrix was then given a small "Cabbage Patch"-type doll.
On appeal, the defendant contends that the State's failure to disclose the offer and the receipt of the "surprise" in return for the prosecutrix's testimony deprived him of his right to exculpatory evidence under Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to establish aBrady violation, the defendant must prove: "(1) The prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; (3) the materiality of the suppressed evidence." Monroe v. Blackburn,607 F.2d 148, 150 (5th Cir. 1979). See Moore v. Illinois,408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Killough v.State, 438 So.2d 311, 316 (Ala.Cr.App. 1982), rev'd on other grounds, Ex parte Killough, 438 So.2d 333 (Ala. 1983).
We assume, without deciding, that the first of theBrady requirements is met here. Although the record does not indicate whether the District Attorney's office had knowledge of the "surprise," the social worker who actually provided the doll, and Dr. Renfro, the clinical psychologist who testified as a State's witness, were aware of the "reward" and did not inform the defense. Cf. Pina v. Henderson, 752 F.2d 47, 49 (2d Cir. 1985) (government agents who work in conjunction with police or prosecutor may be deemed an arm of the State for purposes of imputing their knowledge of exculpatory material to the prosecutor); State v. Gammill, 2 Kan. App. 2d 627,585 P.2d 1074, 1080 (1978) (knowledge of deputy sheriff imputed to the prosecution).
We also assume, without deciding, that the second requisite of Brady is satisfied. In United States v. Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court held that "impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule" of required disclosure.Bagley, 473 U.S. at 676, 105 S.Ct. at 3380. See also Giglio v.United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
(1972).
However, the third requirement, materiality, is lacking. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682,105 S.Ct. at 3380.
Evidence that the prosecutrix was promised and given a "surprise" for her testimony would undermine confidence in the outcome of this case only if there is a reasonable probability that her testimony was thereby influenced to be false. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon *Page 1046 
such subtle factors as the possible interest of the witness intestifying falsely that a defendant's life or liberty may depend." Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173,1177, 3 L.Ed.2d 1217 (1959) (emphasis added).
Dr. Renfro, who saw the prosecutrix before she testified and before she was promised the surprise, testified at the hearing on motion for new trial as follows:
 "A [She] began to become more active, exhibited what I would call classic regression in terms of she began talking baby talk, she curled up in a fetal position, sucked her thumb, became aggressive, throwing toys that she previously had been playing with, spitting, striking out at me, stating that she did not want to go in the room where her daddy was.
 "Q Have you observed this type behavior before in other children?
"A Yes, I have.
 "Q Based on your training and experience do you have an opinion as to what this behavior exhibited?
". . .
 "A I find it associated with extreme fear reactions, very consistent with those detailed in my report, someone who had been subjected to a trauma and faced the possibility of being confronted by the person or situation that traumatized them.
 "Q And would presenting a surprise or telling her a surprise have any effect on that behavior?
 "A Not to my knowledge. That is a very strong set of behaviors and I think even if [she] had been offered something that she was aware of my opinion is I doubt it would have overcome . . .
". . .
 "Q Did you hear or see anyone attempt to get [her] to say something specific by offering her a surprise?
 "A No. The only thing I heard was and I also told her this, was to tell the truth and to be brave."
Even the defense expert, psychologist Dr. Patrick Daniel Slattery, who testified at the hearing on motion for new trial, conceded the following:
 "Q Sir, my question to you is if you told the child to be brave and I have a reward for you, what effect would that have?
 "A The child would be brave to the extent the child knows what to be brave is.
 "Q And if you told the child to tell the truth and I have a reward for you, would not the child also be truthful to the extent the child knew what the truth is?
"A Yes.
 "Q You're not coming in here today and telling Judge Kennedy that [she] lied, are you?
"A No."
There was no evidence presented that either the intent or the effect of promising the prosecutrix a "surprise" was anything other than to allay the child's fear of testifying. In this respect, the situation was somewhat akin to that presented inHaynes v. State, 424 So.2d 669 (Ala.Cr.App. 1982), a prosecution for the rape of an eleven-year-old girl. In Haynes, the trial court addressed the prosecutrix as "sugar," said "nobody is going to bother you," and "gave her a 'candy sucker' to keepher from being nervous." 424 So.2d at 672 (emphasis added). Noting that the record failed to "reflect any improper conduct of the trial judge which prejudiced the defendant," this court concluded: "[W]e cannot say that the trial judge's conduct was so solicitous as to bolster the credibility of the witness and deny the appellant a fair trial." Id.
We recognize the distinctions between Haynes and the instant case, most notably the fact that in Haynes the "gift," or calming device of the candy sucker, was presented in the presence of the defendant, who could have, if he had chosen, inquired whether the gift had any effect on the prosecutrix other than to ease her nervousness, whereas here the entire matter, being unknown to the defense, was unavailable as a tactic for cross-examination or argument to the jury.
Notwithstanding the distinctions between this case andHaynes, however, the nondisclosed evidence does not rise to the level of materiality demanded by the Constitution. *Page 1047 
"The mere possibility that an item of undisclosed informationmight have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) (emphasis added). There is simply no reasonable probability that, had the jury known the prosecutrix was promised a "surprise" by a social worker, they would have determined that her testimony was thereby influenced to be false. It is much more probable that the jury, hearing the previously undisclosed evidence, would conclude that the purpose and effect of the "surprise" here was the same as the purpose and effect of the candy sucker in Haynes — to alleviate the fears of the child witness, but not to influence the content of her testimony.
The defense in this case was that the child had been influenced by her mother and that the child's testimony was false. Obviously, the jury was not persuaded by that theory. Presumedly, the mother would have had a greater influence over the prosecutrix than a social worker with a doll. The defense presented evidence that the mother was a woman inordinately concerned with sexual matters who filed for divorce, sought custody of her daughter, and brought charges of rape and sodomy against her husband within the same week. If the jury was unwilling to find that the child had been influenced, it was most likely because the jury simply found the prosecutrix a credible witness whose testimony had not been falsely influenced by anything.
When, on cross-examination of the prosecutrix, defense counsel attempted to have the jury draw the inference that the child's mother had told her what to say, the following occurred:
 "Q [By Defense Counsel] Did anybody tell you to say any of this today?
"A [By Prosecutrix] Mommy.
 "Q Your mommy? She tell you to say the part about the doo-doo?
"A Yes.
 "Q Did she tell you to say the part about throwing up?
"A Yes.
". . .
"Q Did she tell you to say the part about urine?
"A Yes. All of it.
"Q All of it.
 "MR. ADDISON [Defense Counsel: That's all the questions I have. Thank you very much for coming.
"REDIRECT EXAMINATION
"BY MISS BROOKS [Assistant District Attorney]:
"Q [J]ust one more question. Did it really happen?
"A (Nods affirmatively)
 "Q Did your mommy tell you not to be scared and to tell us what happened?
"A Yes.
 "Q Okay. And the man that did this to you who was it?
"A Daddy."
Because the undisclosed evidence did not meet the constitutional standard of materiality, the prosecution's failure to disclose it to the defense did not deprive the defendant of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment.
 III
The defendant insists that the trial court erred by denying his motion in limine. By this motion he sought to prevent Dr. Guy Renfro from testifying to hearsay conversations with the prosecutrix. He also sought to have excluded testimony that the prosecutrix showed behavior "consistent with" the symptoms commonly displayed by victims of sexual abuse, or "sexual abuse syndrome."
 A. Hearsay
The only hearsay evidence argued as error on appeal is the following:
 "Q [By Assistant District Attorney] All right sir. In talking with [the prosecutrix] did she describe to you an alleged series of rapes and sodomies that occurred in her home involving her and her father? *Page 1048 
"A [By Dr. Renfro] Yes, she did."
"On a charge of rape . . . even though the female's non-consent is not an element of the charge, the mere fact of her having made complaint is admissible. . . . Complaints, when admissible under the foregoing rule, may be testified to either by the victim or by other third party witnesses." C. Gamble,McElroy's Alabama Evidence § 178.01 at 361 (3d ed. 1977). Moreover, when, on cross-examination of the prosecutrix, the defense elicited from her the fact that she had told Dr. Renfro what her father did to her, there was no error in allowing Dr. Renfro to testify to the same facts. Burkes v. State,350 So.2d 1067, 1068 (Ala.Cr.App.), cert. quashed, Ex parte Burkes,350 So.2d 1069 (Ala. 1977).
Ex parte Anonymous, 502 So.2d 1215 (Ala. 1987), cited by the defendant for the proposition that reports of officers investigating a sexual abuse complaint are hearsay, is distinguishable. In Anonymous, the court held inadmissible a social worker's testimony that her interview of the victims "confirmed the original report." Anonymous v. State,502 So.2d 1211, at 1212. The statement in Anonymous had the effect, not of merely relating that a complaint was made, but of verifying the truthfulness of the complaint. Furthermore, the testimony in Anonymous bolstered an inadmissible written report. In the present case, the psychologist's statement did not allude to his written report and the State did not introduce the report into evidence.
 B. "Sexual Abuse Syndrome"
On direct examination by the State, Dr. Renfro, who treated the prosecutrix in fourteen one-hour sessions, was asked to describe the "generally accepted symptoms" of a child sexual abuse victim. He named the following: fear and anxiety, hostility and anger, increased attention to and knowledge of sexual issues, self-stimulation, and startled responses to innocuous comments. He stated that the prosecutrix displayed some of these symptoms and related specific instances of her behavior as examples. When asked whether certain conduct by the prosecutrix was "consistent with a victim of sexual abuse at her age," he answered "yes." He also testified that, among young victims of sexual abuse, the following actions are common: to delay reporting the abuse, to avoid discussion of the abuse, to downplay the emotional impact of the abuse (to "present it very matter-of-factly"), and to be unable to face the abusing parent. Finally, the State asked him, "Have you seen [the prosecutrix] here today?" He answered in the affirmative. The prosecutor then inquired, "Have you seen any of those symptoms here today?" He answered, "Yes."
The defendant argues that all of the foregoing testimony was objectionable because it was invasive of the province of the jury and because it was an impermissible opinion on the ultimate fact in issue. The ultimate fact in issue, however, was whether the defendant raped and sodomized the child, seeAllen v. State, 472 So.2d 1122, 1127 (Ala.Cr.App. 1985), and Dr. Renfro did not give his opinion on that issue. Nor did he diagnose the child as a victim of sexual abuse, or say that she suffered from "sexual abuse syndrome." See Hill v. State,507 So.2d 554, 557 (Ala.Cr.App. 1986), cert. denied, Ex parte Hill,507 So.2d 558 (Ala. 1987) (testimony that victim had "battered spouse syndrome" admissible) (Bowen, P.J., concurring). Eslavav. State, 473 So.2d 1143, 1147 (Ala.Cr.App. 1985) (testimony that victim fit "battered child syndrome" admissible). Seegenerally Annot., 42 A.L.R. 4th 879 (1985) (rape trauma syndrome); Annot., 18 A.L.R. 4th 1153 (1982) (battered wife syndrome); Annot., 98 A.L.R.3d 306 (1980) (battered child syndrome).
Dr. Renfro's diagnosis was "post-traumatic stress disorder of an acute type." He did state that he "very strongly" believed that the prosecutrix was "sexually abused." Although some courts have held similar testimony invasive of the province of the jury because it constitutes, in effect, an opinion that the prosecutrix is telling the truth, see, e.g., People v. Roscoe,168 Cal.App.3d 1093, 215 Cal.Rptr. 45 (1985); State v.Castore, 435 A.2d 321 (R.I. 1981); State v. Fitzgerald, 39 Wn. App. 652, 694 P.2d 1117 (1985); State v. Haseltine, *Page 1049 120 Wis.2d 92, 352 N.W.2d 673 (Wis.App. 1984), other courts have concluded that such evidence is admissible because it assists the trier of fact, see, e.g., State v. Kim, 64 Haw. 598,645 P.2d 1330 (1982); State v. Myers, 359 N.W.2d 604 (Minn. 1984);State v. Middleton, 294 Or. 427, 657 P.2d 1215 (1983); State v.Claflin, 38 Wn. App. 847, 690 P.2d 1186 (1984). See generally
McCord, "Expert Psychological Testimony About Child Complaintsin Sexual Abuse Prosecutions: A Foray Into the Admissibility ofNovel Psychological Evidence," 77 J.Crim.L. Criminology 1, 14-64 (1986) [hereinafter cited as "McCord, 'ExpertPsychological Testimony' "].
"We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved."Bell v. State, 435 So.2d 772, 776 (Ala.Cr.App. 1983) (quotingHamilton v. United States, 73 F.2d 357, 358 (5th Cir. 1934)). In McCord, "Expert Psychological Testimony," supra, the author outlines a balancing test to determine whether such evidence should be admitted in cases of child sexual abuse. "A review of the case law and commentary suggests that there are four general factors that should be considered: necessity, reliability, understandability, and importance." McCord,"Expert Psychological Testimony" at 31. We refer those interested to the rather lengthy commentary explaining the sub-inquiries under each category, but we note that, in general, the categories are defined as follows:
 Necessity — the extent to which a fair trial makes expert opinion critical. For example, expert opinion may be extremely necessary in a case where, as here, the defense raises the inference that because the prosecutrix delayed reporting the abuse her story is suspect. This inference should be allowed to be rebutted by expert testimony that delayed reporting is very common among child sexual abuse victims.
 Reliability — the extent to which the subject of expert opinion has achieved general acceptance in the relevant scientific community. This category accommodates the concerns underpinning the Frye
test. See Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
 Understandability — the extent to which the expert opinion will actually assist the trier of fact. Is it beyond the knowledge of the average juror? Can it be easily explained and/or is it likely to overwhelm the jury?
 Importance — the extent to which the expert opinion is dispositive of the issue in the case. This category accommodates the concerns underlying the rule against testimony on the "ultimate issue." A high degree of importance, unlike all the other categories, weighs against admissibility.
Our weighing of the factors convinces us that Dr. Renfro's testimony was admissible. Though it may not have possessed a high degree of reliability (in the sense that "[t]he behavioral scientific literature conclusively demonstrates that there is no general acceptance of the ability of experts in the field to diagnose a child as having been sexually abused," id. at 38), it did have a high degree of understandability (in the sense that it was easily explained and not likely to overwhelm the jury). Most significantly, even though its importance to the issue being decided was somewhat high, its necessity was extremely great.
The necessity for expert testimony increases if there are certain inferences made by the defense (such as the implication that the child's delay in reporting the abuse indicates fabrication, id. at 59), or certain unusual behavior of the child witness which "should not be allowed to go unrebutted when there exists a recognized phenomenon which may explain it," id. at 62.
In the present case, Dr. Renfro's opinion that it is common for child abuse victims to delay reporting the abuse was necessary to rebut the implication of the defense that the child's testimony was suspect because she waited so long to tell her mother. "Courts have unanimously upheld the admissibility of expert testimony introduced by the prosecution to take the steam out of this argument by explaining that often out *Page 1050 
of confusion, fear and ambiguous feelings about the abuser, children delay substantial periods of time in reporting the abuse. . . ." Id. at 59.
Similarly, Dr. Renfro's testimony that it is common for children who have been sexually abused to downplay the emotional impact of the trauma was necessary in order to explain the prosecutrix's rather "matter-of-fact" description of some of the incidents of abuse. By the same token, the psychologist's testimony that it is common for a child to be unwilling to talk about the abuse or to face the abusing parent, was made necessary by the prosecutrix's refusal to describe an incident and to point out her father in the courtroom. As noted in McCord, "Expert PsychologicalTestimony," the explanations by the psychologist were "necessary in order to counter [possible] irrational prejudices that may exist in an ordinary juror," id. at 31, when confronted with a child witness whose conduct might appear inappropriate.
Under the facts of this case, the necessity factor is especially significant when compared with the other three factors and tips the balance in favor of admissibility. We find that the trial court did not abuse its discretion in allowing Dr. Renfro's testimony.
 IV
The defendant claims that the trial court erred in rejecting his offer to prove that Kathryn Sexton, his former wife and the victim's mother, came from a family whose members had a pattern of charging their spouses with sexual improprieties during divorce proceedings.
He made an offer of proof that Mrs. Sexton's mother and brother, having been the plaintiffs in recent divorce actions, had both charged their former spouses with acts of homosexuality. He further offered to prove that Mrs. Sexton was very close to her mother and brother, had been influenced by their supposed preoccupation with sexual aberrations, and had planted the idea of sexual abuse in her daughter's mind in order to insure that she obtained custody of the child after her divorce from the defendant.
Although a fact is relevant if it has any tendency to shed light on the main inquiry, Ward v. State, 52 Ala. App. 392, 394,293 So.2d 307, 309 (1974), "[i]t is generally held that the trial court has the discretion to exclude testimony which will confuse or multiply the issues in the minds of the jurors," C. Gamble, McElroy's Alabama Evidence § 21.01(3). "Whatever tends to shed light on the main inquiry, and does not withdraw attention from such main inquiry by obtruding upon the minds of the jury matters which are foreign, or of questionable pertinency, is, as a general rule, admissible evidence."Richardson v. State, 204 Ala. 124, 128, 85 So. 789, 793 (1920).
The evidence offered by the defense tended to shed light on the question whether the victim's story was the product of her mother's suggestion, an issue raised by the defense on cross-examination of the victim and the child psychologist as well as on direct examination of the victim's mother. However, the evidence also tended to multiply the issues, to withdraw the jury's attention from the main inquiry, and to focus the jurors' minds upon matters entirely foreign to the charge, such as whether the allegations of spousal homosexuality brought by Mrs. Sexton's mother and brother were true or false, and whether or not the family, in fact, shared a "preoccupation" with sexual matters.
As the court noted in Fincher v. State, 58 Ala. 215 (1877), "If [the] evidence had been admitted, it would have beensubject to be controverted, and the jury would have been embarrassed in determining a disputed fact, which, when ascertained, would not have advanced them in the determination of the principal fact." 58 Ala. at 220 (emphasis added).
The prospect of the State's calling the former spouses or acquaintances of the two family members to dispute the charges of homosexuality illustrates the reason behind the rule forbidding multiplication of issues. The defendant's offer of proof presented a prime example of the dangers *Page 1051 
inherent in evidence which, by multiplying the issues, could obscure the original inquiry.
The evidence was also subject to the further objection that it required pure guesswork in order to arrive at the conclusion for which it was argued. In San Antonio Traction Co. v. Cox,184 S.W. 722 (Tex.Civ.App. 1916), the plaintiff sued for injuries received while alighting from a streetcar. The defendant offered to prove a conspiracy among plaintiff's family to defraud the company, arguing that claims for similar injuries had been made by eleven of plaintiff's relatives. The court, although conceding that mere probabilities made the evidence appear probative, rejected the offer of proof on a conspiracy theory because the evidence failed to connect the plaintiff with the other claims. "It is just as probable, if not more so, that each incident stood alone as that a conspiracy existed, and it is mere guesswork to say that any of the parties conspired together." 184 S.W. at 724. The same can be said for the claimed family "pattern" or "preoccupation" here.
For the foregoing reasons, the trial court did not abuse his discretion in excluding the evidence.
 V
The defendant's first wife, Ann Carol Parker, testified as a character witness for the defense. On cross-examination, the State asked Ms. Parker whether the defendant ever had any pictures of her "in compromising positions or nude." She answered, "not to my knowledge." Defense counsel then objected on grounds of irrelevance, asked that the jury be instructed to disregard the question, and moved for a mistrial. The trial court overruled the objection, denied the motion for mistrial, and gave no instruction to the jury. Arguing that the question was relevant to show Ms. Parker's bias, the State informed the court that it had "evidence that [the prosecutrix] was shown pictures by the Defendant of a woman, an adult woman, in sexual circumstances and that [the prosecutrix] believes it to be the first wife, this lady."
We fail to see how the defendant's having shown the prosecutrix nude pictures of his first wife, even if true, established the bias of the first wife. The State's question was improper. "A witness to character, whether on direct, or cross, examination, is confined to a statement of general reputation in the community, and evidence of particular acts is inadmissible." Patrick v. State, 39 Ala. App. 240, 245,97 So.2d 589, 594 (1957). "Generally, on cross-examination of a defendant's character witness, who has testified to accused's good reputation, the prosecution may not elicit personal knowledge of the witness concerning specific misdeeds of the defendant." Mitchell v. State, 50 Ala. App. 121, 128,277 So.2d 395, 402 (Ala.Cr.App.), cert. denied, 291 Ala. 794,277 So.2d 404 (1973). See generally Hooper v. State, 523 So.2d 469
(Ala.Cr.App. 1986).
Nevertheless, "[w]hen a question is asked of a witness calling for inadmissible matter, it is mandatory upon the party against whom it is offered to object after the question but before the answer." C. Gamble, McElroy's Alabama Evidence § 426.01(3) at 793-94. An objection not made until after a responsive answer is given comes too late. Williams v. State,383 So.2d 547, 559 (Ala.Cr.App. 1979), aff'd, Ex parte Williams,383 So.2d 564 (Ala.), cert. denied, Williams v. Alabama,449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Furthermore, a negative answer to an improper question does not constitute reversible error. Reeves v. State, 456 So.2d 1156, 1161
(Ala.Cr.App. 1984); Young v. State, 416 So.2d 1109, 1113
(Ala.Cr.App. 1982). Even when the question itself is improper, a negative answer cannot result in harm to the accused. Barton v.State, 376 So.2d 756, 760 (Ala.Cr.App.) cert. denied, Ex parteBarton, 376 So. 761 (Ala. 1979). Because "[a] negative response by a character witness to a question relating to the defendant's prior misconduct removes the possibility of any injury to the defendant," Hill v. State, 366 So.2d 296, 316
(Ala.Cr.App. 1978), aff'd, Ex parte Hill, 366 So.2d 318
(Ala. 1979), the declaration of a mistrial was not warranted here. "The *Page 1052 
entry of a mistrial is not lightly to be undertaken. . . . [T]he entry should be only a last resort, as in cases ofotherwise ineradicable prejudice." Leverett v. State,462 So.2d 972, 978 (Ala.Cr.App. 1984) (emphasis in original). "A motion for a mistrial implies a miscarriage of justice and should only be granted where it is clearly manifest that justice cannot be afforded. It specifies such fundamental error in a trial as to vitiate the result." Dickey v. State, 390 So.2d 1177, 1178
(Ala.Cr.App.), cert. denied, Ex parte Dickey, 390 So.2d 1178
(Ala. 1980).
 VI
The defendant called Kathryn Sexton as his witness. When he began to question her about facts surrounding the issuance of the arrest warrant against him, the trial court sustained the State's objection. The defendant claims that his right to a thorough and sifting cross-examination was thereby abridged. The trial court's ruling was not error.
The defendant never requested that Mrs. Sexton be deemed an adverse witness for purposes of cross-examination. "[A]ccording to the Adverse Witness Rule, a party may impeach his own witness if the trial judge determines that witness to be 'adverse.' " Weaver v. State, 466 So.2d 1037, 1040
(Ala.Cr.App. 1985) (emphasis added). In the absence of a request to designate the witness as "adverse," and a ruling from the trial court, there is no action upon which to predicate review.
Moreover, despite its earlier ruling, the court later allowed testimony regarding what Mrs. Sexton "swore to" in the arrest warrant affidavit, thereby rendering harmless any possible error in the first ruling. See Rule 45, A.R.A.P.
 VII
The defendant contends that he is entitled to a new trial on the basis of the alleged newly discovered evidence suggesting that, if the prosecutrix was sexually abused, her seventeen-year-old half-brother Richard could have been responsible. The defendant presented evidence at the hearing on his motion that Richard had access to the prosecutrix, had once been investigated as a "peeping Tom," had pretended to eat dog feces in front of the prosecutrix, and had chased his step-brother around the room while he (Richard) was naked. The defendant maintains that the foregoing evidence indicates that the prosecutrix "attributed Richard's actions" to her father.
 "To establish the right to a new trial based on newly discovered evidence, the appellant must show: (1) that the evidence will probably change the result if a new trial is granted; (2) that it has been discovered after the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching." Isom v. State, 497 So.2d 208, 212 (Ala.Cr.App. 1986).
The witnesses called by the defense at the hearing on motion for new trial established that, with the exception of Richard's chasing his step-brother around the room nude, the defendant knew about all of the other proposed evidence prior to trial. Consequently, this evidence cannot be considered "newly discovered." Furthermore, the incident concerning Richard and his step-brother was not material to the issue of who raped and sodomized the prosecutrix and, therefore, would not "probably change the result" if a new trial were granted.
All of the foregoing evidence, which the defense claims is suggestive of the fact that Richard could be the guilty party because of his "sexual pranks," appellant's brief at 41, is entirely speculative. Even if Richard himself had testified on motion for new trial that he committed the offense charged, this testimony would not automatically entitle the defendant to a new trial. See McDonald v. State, 451 So.2d 440
(Ala.Cr.App. 1984) (on return to remand); Tankersley v. State,448 So.2d 486 (Ala.Cr.App. 1984); Robinson v. State,389 So.2d 144 (Ala.Cr.App.), cert. denied, Ex Parte Robinson,389 So.2d 151 (1980).
"The appellate courts look with disfavor on motions for new trial based on newly *Page 1053 
discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion." McBryar v. State,368 So.2d 568, 574 (Ala.Cr.App.), cert. denied, 368 So.2d 575
(Ala. 1979). There was no abuse of discretion here.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.