Windell Lane SEXTON, Petitioner–
Appellant,

v.

E. Dale HOWARD; James H. Evans, At-
torney General of the State of Alabama;
Beth Slate Poe, Assistant Attorney Gen-
eral, Respondents–Appellees.

No. 93–6345.

United States Court of Appeals,
Eleventh Circuit.

June 27, 1995.

**1558**

David B. Byrne, Jr., Montgomery, AL, for appellant.

James H. Evans, Atty. Gen., Beth S. Poe, Asst. Atty. Gen., Montgomery, AL, for appellees.

Before CARNES and BARKETT, Circuit Judges, and JOHNSON, Senior Circuit Judge.

PER CURIAM:

Windell Lane Sexton, a prisoner of the State of Alabama, appeals from the district court's order denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Sexton's petition raises numerous challenges, all but one of which we reject without further discussion for reasons articulated in the magistrate judge's report and recommendation as adopted by the district court. The only issue warranting additional discussion is whether the prosecutor's conduct in sitting on the witness stand with the child victim while the child testified requires that relief be granted. We affirm the district court's denial of relief on the ground that any error did not prejudicially affect Sexton's substantial rights.

## I. BACKGROUND

Windell Lane Sexton was convicted in the Circuit Court of Montgomery County, Alabama, in May of 1986 for raping and sodomizing his four-year-old daughter, Amy. At the time of the trial, Amy was five years old. Throughout her testimony, Chief Deputy District Attorney Ellen Brooks sat on the witness stand with her. Over defense counsel's objection, Brooks conducted the direct and redirect examinations of Amy while Amy was either sitting on her lap or sitting next to her on the stand, and Brooks continued to sit with Amy on the witness stand while defense counsel cross-examined her. On three occasions during Amy's cross-examination, Brooks interjected with comments to Amy.[1]

After conviction, Sexton was sentenced to twenty-five years imprisonment on each charge. Sexton's conviction was affirmed on direct appeal. *Sexton v. State*, 529 So.2d 1041 (Ala.Crim.App.1988). Among other issues, Sexton argued on appeal that when the trial court allowed the prosecutor to sit on the witness stand, it enabled the prosecutor implicitly to "improperly bolster the child's credibility by vouching for her veracity." Sexton contended that this arrangement "add[ed] the prestige of [the prosecutor's] office to the credibility of the star witness," and that it "implied fully to the jury that [the prosecutor] believed [Amy] was telling the truth...." The Alabama Court of Criminal Appeals agreed with Sexton that it is generally improper for the prosecutor to sit on the witness stand because of the possibility that a jury might believe the prosecutor's action indicated a personal belief in the credibility of the witness. *Id.* at 1044. However, the court affirmed the conviction, explaining:

> Although we do not condone the action of the State's attorney here and we caution prosecutors to refrain from similar actions in the future, we do not find that the trial court's overruling of the defendant's objection to this practice constituted reversible error under the circumstances of this particular case.... The trial judge was in the best position to determine what, if any, probable effect this action would have on the jury.

---

1. In one instance, Amy paused after defense counsel asked her whether she had told the other prosecuting attorney about the abuse. Amy answered after Brooks added, "That man right there." On another occasion defense counsel asked Amy how many times she had practiced her testimony in the courtroom. Amy asked, "What do I say?" and Brooks replied, "Answer the man. Tell him the truth." Amy then answered, "One." Then, after defense counsel asked Amy how many times she had seen Dr. Guy Renfro, the psychologist who had examined her, Brooks said, "Tell him the truth."

*Id.* at 1044. In July 1988, the Alabama Supreme Court denied certiorari. *Id.* at 1041.

Sexton then filed a petition in state court for post-conviction relief. The state trial court denied relief and the Alabama Court of Criminal Appeals affirmed without opinion. Having exhausted his state court remedies, Sexton filed a 28 U.S.C. § 2254 petition for habeas corpus relief in the United States District Court for the Middle District of Alabama. In his petition Sexton once again challenged the prosecutor's conduct in sitting on the stand as improper bolstering of the witness' testimony.

The magistrate judge recommended denying Sexton's petition without an evidentiary hearing and dismissing the petition with prejudice. Examining all of the circumstances, he concluded that the conduct in question did not actually prejudice Sexton or render his trial fundamentally unfair. The district court denied relief by adopting the magistrate judge's recommendation finding that the prosecutor's actions did not amount to improper bolstering or vouching for the credibility of the witness.

## II. DISCUSSION

Sexton does not argue that constitutional error occurs whenever someone accompanies a child on the witness stand during the child's testimony. As Sexton points out, in the Child Witnesses' Rights Act, 18 U.S.C.A. § 3509(i), Congress has explicitly authorized the use of adult attendants to accompany a child on the witness stand in federal trials. That act even provides that the court "may allow the adult attendant to hold the child's hand or allow the child to sit on the adult attendant's lap throughout the course of the proceeding," *id.* at § 3509(i). As Sexton also points out, however, that statute contains certain safeguards, such as a requirement that the adult attendant be videotaped while the child is testifying. *Id.* In any event, the federal statute is inapplicable to state court trials, and it does not address Sexton's contention in this case, which is that the presence of the *prosecutor* on the witness stand vouched for Amy's credibility and thus denied him a fair trial. Our

review of the district court's decision is "plenary because improper vouching is a mixed question of law and fact." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir.1991).

This Court has developed the following two-prong test for prosecutorial misconduct: (1) the conduct must be improper, and (2) the conduct "must prejudicially affect the substantial rights of the defendant." *Id.* After a careful review of the record, it is clear that Sexton is not entitled to relief because the prosecutor's conduct did not "prejudicially affect the substantial rights of the defendant," *Eyster*, 948 F.2d at 1206. A prosecutor's vouching "prejudicially affect[s] the substantial rights of the defendant when [it] so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 1206–07 (citations and internal quotation marks omitted). In deciding whether the conduct in question rises to that level, we determine whether there is a reasonable probability that, but for the conduct, the outcome of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See Eyster*, 948 F.2d at 1206–07; *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir.1991) (prosecutorial argument issue), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992). After examining the record in this case, we find no reasonable probability that if the prosecutor had not sat with the witness the outcome of this case would have been different.

Among other testimony, at trial, Amy testified that her father on many occasions had taken her clothes off, taken his clothes off, put her on the bed, climbed on top of her, and put his penis in her vagina. She said that her father had done this to her when her mother was away at the hospital and sometimes when her mother was at work. She said that her daddy hurt her when he did this, that her vagina would bleed. Amy testified that while she was being violated she would lie still and pull on her hair.

Amy demonstrated what her father had done to her with the aid of two dolls, one of which represented her and one of which represented her father. When asked whether

anyone else had ever done any of those things to her, Amy replied, "[n]o, just daddy."

After Amy's testimony, the state called Dr. Renfro, a psychologist, who testified about his several meetings with Amy, the various psychological tests he had performed on her, and his observations of Amy's behavior. Dr. Renfro told the jury that Amy had displayed fear and anxiety, hostility and anger, increased knowledge of and attention to sexual matters, an intensification of emotions, and increased sexual self-stimulation. He testified that when Amy was resting her head on the table during a psychological test, and he wanted her attention "she raised her head very quickly, her face displayed the physical manifestations which reflect fear and she stated . . . that she did not want to sleep with me, she would not sleep with me, she did not want me to get in bed with her." Although Dr. Renfro stated that he could not say with certainty who had sexually abused Amy, he testified that Amy had emphatically told him that her daddy, and no one else, had done these things to her.

The State then called Amy's half-brother, Richard Vass, who testified that, although he had never personally witnessed any abuse, he knew that Amy had been alone with Sexton quite often, including a couple of days during Mrs. Sexton's hospital stay. Vass stated that he had heard Amy tell Sexton on several occasions not to touch her, and once he had heard Amy tell Sexton, "Daddy, don't touch me in my private place." Vass also testified that he saw Amy alone in the dining room rubbing her pubic area against the corner of the china cabinet. When he asked Amy what she was doing, she just closed her eyes, covered her ears, and would not speak to him.

The State's last witness was Doctor Judi Jehle, Amy's examining physician. Dr. Jehle explained how she twice attempted to examine Amy in her office, but each time Amy was too frightened to proceed. Dr. Jehle finally admitted Amy to the hospital so that she could conduct the examination under anesthesia. Dr. Jehle testified that although she could find no scarring, Amy's hymen had been broken, which was "most unusual . . . in someone that young." Dr. Jehle then explained how it was possible for Amy to have no scarring even if something larger had been inserted and had caused Amy to suffer a tear in her vagina.

The defense's first witness was Kathryn Sexton, Amy's mother. The defense elicited testimony from Mrs. Sexton about how she had been contemplating divorcing Sexton prior to Amy's disclosure. The defense was apparently attempting to suggest that Mrs. Sexton's words and behavior toward her daughter could have planted the idea of sexual activity in Amy's mind. However, much of Mrs. Sexton's testimony was damaging to the defense. Mrs. Sexton testified that she had witnessed several things that had caused her concern: she saw her husband allow Amy to pull his underwear down while he was lying on the bed; she saw Amy simulating intercourse with her dolls; she thought Amy's vagina looked overly large for a girl her age, and she had observed evidence of physical injury which Amy attributed to her father.

■ We join the Alabama Court of Criminal Appeals in not condoning what the prosecutor did in this case and in cautioning prosecutors to refrain from such conduct in the future. Nonetheless, when we consider the totality of the evidence of Sexton's guilt, we conclude that under the circumstances presented here there is no reasonable probability that the result would have been different had the prosecutor not sat with Amy while she testified.

AFFIRMED.